Query    Reports    Utilities    Help    Log Out

CIVIL

# U.S. District Court
# Eastern District of California - Live System (Sacramento)
# CIVIL DOCKET FOR CASE #: 2:21-cv-01004-KJM-AC

Camacho et al v. NEC Networks, LLC, et al
Assigned to: Chief District Judge Kimberly J. Mueller
Referred to: Magistrate Judge Allison Claire
Case in other court: 2:11-cr-0234 TLN
Cause: 28:1332 Diversity-Personal Injury

Date Filed: 06/04/2021
Jury Demand: Plaintiff
Nature of Suit: 360 P.I.: Other
Jurisdiction: Federal Question

**Plaintiff**

**Echoe Camacho**

represented by **Daniel L. Warshaw**
Pearson, Simon, Warshaw & Penny, LLP
15165 Ventura Blvd.
Suite 400
Sherman Oaks, CA 91311
818-788-8300
Fax: 818-788-8104
Email: dwarshaw@pswlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Melissa S Weiner , PHV**
Pearson, Simon & Warshaw, LLP
800 LaSalle Ave
Suite 2150
Minneapolis, MN 55402
612-389-0600
Fax: 612-389-0601
Email: mweiner@pswlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hassan A. Zavareei**
Tycko And Zavareei LLP
1828 L Steet NW
Suite 1000
Washington, DC 20036
510-254-6808
Email: hzavareei@tzlegal.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**T. C.**
*a minor child, by and through Echoe*
*Camacho*

represented by **Daniel L. Warshaw**
(See above for address)
*LEAD ATTORNEY*

*guardian ad litem*
Echoe Camacho

**Melissa S Weiner , PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hassan A. Zavareei**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**NEC Networks, LLC**                    represented by   **Johnny Lee Antwiler , II**
*d/b/a CaptureRx*                                          O'Hagan Meyer
*Doing business as*                                        1601 Pacific Coast Hwy.
CaptureRx                                                  Suite 290
                                                           Hermosa Beach, CA 90254
                                                           949-942-8500
                                                           Email: jantwiler@ohaganmeyer.com
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Samuel Y Edgerton , III**
                                                           O'hagan Meyer
                                                           1601 Pacific Coast Highway, Suite 290
                                                           Hermosa Beach, CA 90254
                                                           310-949-8500
                                                           Email: sedgerton@ohaganmeyer.com
                                                           *TERMINATED: 07/19/2021*

**Defendant**

**Rite Aid Corporation**                  represented by   **Jason J. Kim**
*TERMINATED: 07/26/2021*                                   Hunton Andrews Kurth LLP
                                                           550 S. Hope St.
                                                           Suite 2000
                                                           Los Angeles, CA 90071
                                                           213-532-2000
                                                           Email: kimj@hunton.com
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Samuel Y Edgerton , III**
                                                           (See above for address)
                                                           *TERMINATED: 07/19/2021*

**Defendant**

**Rite Aid Hdqtrs. Corp.**

| Date Filed | # | Docket Text |
| --- | --- | --- |

| | | |
|---|---|---|
| 06/04/2021 | 1 | COMPLAINT against All Defendants by Echoe Camacho, T.C., Attorney Zavareei, Hassan A. added. (Filing fee $ 402, receipt number 0972-9638581) (Attachments: # 1 Exhibit A, # 2 Civil Cover Sheet)(Zavareei, Hassan) (Entered: 06/04/2021) |
| 06/04/2021 | 2 | PETITION to APPOINT GUARDIAN AD LITEM by Echoe Camacho. (Attachments: # 1 Proposed Order)(Zavareei, Hassan) (Entered: 06/04/2021) |
| 06/07/2021 | 3 | SUMMONS ISSUED as to *NEC Networks, LLC, Rite Aid Corporation* with answer to complaint due within *21* days. Attorney *Hassan A. Zavareei* *Tycko And Zavareei LLP* *1828 L Steet NW, Suite 1000* *Washington, DC 20036*. (Benson, A.) (Entered: 06/07/2021) |
| 06/07/2021 | 4 | CIVIL NEW CASE DOCUMENTS ISSUED; Initial Scheduling Conference set for 10/14/2021 at 02:30 PM in Courtroom 3 (KJM) before Chief District Judge Kimberly J. Mueller. (Attachments: # 1 Standing Order, # 2 Consent Form, # 3 VDRP) (Benson, A.) (Entered: 06/07/2021) |
| 06/22/2021 | 5 | STIPULATION to Extend Deadline to Respond to 1 Complaint Pursuant to Local Rule 144(a) by Rite Aid Corporation. Attorney Kim, Jason J. added. (Kim, Jason) (Entered: 06/22/2021) |
| 06/23/2021 | 6 | CORPORATE DISCLOSURE STATEMENT by Defendant Rite Aid Corporation. (Kim, Jason) (Entered: 06/23/2021) |
| 07/01/2021 | 7 | NOTICE of APPEARANCE by Samuel Y Edgerton, III on behalf of NEC Networks, LLC, Rite Aid Corporation. Attorney Edgerton, Samuel Y added. (Edgerton, Samuel) (Entered: 07/01/2021) |
| 07/01/2021 | 8 | STIPULATION to extend time to respond re 1 Complaint by NEC Networks, LLC. (Edgerton, Samuel) Modified on 7/7/2021 (Mena-Sanchez, L). (Entered: 07/01/2021) |
| 07/12/2021 | 9 | SUMMONS RETURNED EXECUTED: (Zavareei, Hassan) (Entered: 07/12/2021) |
| 07/12/2021 | 10 | SUMMONS RETURNED EXECUTED: (Zavareei, Hassan) (Entered: 07/12/2021) |
| 07/19/2021 | 11 | STIPULATION and PROPOSED ORDER to Substitute Party Defendant and Change Case Caption by Rite Aid Corporation. (Kim, Jason) Modified on 7/19/2021 (Huang, H). (Entered: 07/19/2021) |
| 07/19/2021 | 12 | NOTICE of APPEARANCE by Johnny Lee Antwiler, II on behalf of NEC Networks, LLC. Attorney Antwiler, Johnny Lee added. (Antwiler, Johnny) (Entered: 07/19/2021) |
| 07/19/2021 | 13 | NOTICE of WITHDRAWAL of COUNSEL Samuel Y. Edgerton , III by NEC Networks, LLC. (Antwiler, Johnny) Modified on 7/20/2021 (Huang, H). (Entered: 07/19/2021) |
| 07/23/2021 | 14 | STIPULATION to Extend Time to Respond to Initial Complaint by NEC Networks, LLC. (Antwiler, Johnny) (Entered: 07/23/2021) |
| 07/26/2021 | 15 | PRO HAC VICE APPLICATION and PROPOSED ORDER submitted by T. C., Echoe Camacho for attorney Melissa S. Weiner to appear Pro Hac Vice. Attorney Warshaw, Daniel L. added. (Filing fee $ 225, receipt number ACAEDC-9728771) (Attachments: # 1 Exhibit MN Certificate of Good Standing, # 2 Exhibit Ny Certificate of Good Standing) (Warshaw, Daniel) (Entered: 07/26/2021) |
| 07/26/2021 | 16 | STIPULATION and ORDER signed by Chief District Judge Kimberly J. Mueller on 7/23/2021 SUBSTITUTING Defendant Rite Aid Hdqtrs. Corp. for Defendant Rite Aid Corporation. Rite Aid Hdqtrs. Corp. added. Rite Aid Corporation terminated.(Huang, H) (Entered: 07/26/2021) |
| 07/27/2021 | 17 | PROPOSED ORDER re Stipulation to Extend Time to Respond to Initial Complaint re 14 |

| | | |
|---|---|---|
| | | Stipulation by NEC Networks, LLC. (Antwiler, Johnny) (Entered: 07/27/2021) |
| 07/30/2021 | 18 | ORDER signed by Chief District Judge Kimberly J. Mueller on 7/30/2021 EXTENDING Defendants NEC Networks, LLC d/b/a CaptureRx and Rite Aid Corporation's time to answer, move or otherwise respond to 1 Complaint up to and including 8/31/2021. (Huang, H) (Entered: 07/30/2021) |
| 08/04/2021 | 19 | ORDER signed by Chief District Judge Kimberly J. Mueller on 8/4/21 GRANTING 15 Application for Pro Hac Vice. ADDED Attorney Melissa S Weiner, PHV for T. C. and Echoe Camacho. The Pro Hac Vice attorney is directed to request electronic filing access through PACER. (Kastilahn, A) (Entered: 08/04/2021) |
| 08/16/2021 | 20 | ORDER signed by Chief District Judge Kimberly J. Mueller on 08/16/21 GRANTING re 2 Motion to Appoint Echoe Camacho as GAL for minor T.C. (Benson, A.) (Entered: 08/16/2021) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 08/17/2021 07:37:40 | | | |
| **PACER Login:** | mbrady1656 | **Client Code:** | Woodrome |
| **Description:** | Docket Report | **Search Criteria:** | 2:21-cv-01004-KJM-AC |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

Hassan A. Zavareei (CA Bar No. 181547)
**TYCKO & ZAVAREEI LLP**
1828 L Street NW, Suite 1000
Washington, D.C. 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
Email: hzavareei@tzlegal.com

Daniel L. Warshaw (CA Bar No. 185365)
**PEARSON, SIMON & WARSHAW, LLP**
15165 Ventura Blvd., Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104
Email: dwarshaw@pswlaw.com

*Counsel for Plaintiffs and the Proposed Class and Subclasses*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| Echoe Camacho, and by and through her, T.C., her minor child,<br><br>individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NEC Networks, LLC d/b/a CaptureRx and Rite Aid Corporation,<br><br>Defendant. | No.<br><br>**<u>CLASS ACTION</u>**<br><br>**PETITION FOR APPOINTMENT OF GUARDIAN AD LITEM** |

Plaintiffs Echoe Camacho ("Ms. Camacho") and her minor child, T.C. ("T.C.") (together, "Plaintiffs"), individually and on behalf of all other persons similarly situated, and through their attorneys of record, allege the following against Defendants NEC Networks, LLC d/b/a CaptureRx ("CaptureRx") and Rite Aid Corporation ("Rite Aid") (together, "Defendants") based upon personal knowledge with respect to themselves, on information and belief derived from investigation of counsel, and review of public documents as to all other matters.

## INTRODUCTION

1.      CaptureRx is a healthcare technology company and specialty pharmacy benefits manager whose services include prescription claims processing, patient assistance program administration, and public health service 340B drug program administration. CaptureRx provides these services for pharmacies and healthcare providers across the United States, including Rite Aid.[1]

2.      T.C. is a minor child who had his prescription filled at Rite Aid.  Ms. Camacho is the natural parent of T.C. Ms. Camacho filled T.C.'s prescription at Rite Aid and, thus, was required to provide Rite Aid with T.C.'s Personal Health Information ("PHI") and personal identifiable information ("PII"). Unfortunately for Plaintiffs, Defendants did not adequately safeguard that PHI or PII. As a result, T.C. and hundreds of thousands of Defendants' other customers ("Customers") are now the victims of a large-scale, long-lasting data breach that will impact them for years to come (the "Data Breach"). Specifically, the Data Breach exposed T.C.'s (1) first name, (2) last name, (3) date of birth, and (4) prescription information.

3.      Defendants are responsible for allowing the Data Breach to occur because they failed to implement and maintain reasonable safeguards and failed to comply with industry-standard data security practices.

4.      During the duration of the Data Breach, Defendants failed to detect unauthorized third parties' access to T.C.'s and Class members' data, notice the massive amounts of data that were compromised, and failed to take any steps to investigate the red flags that should have warned Defendants that their systems were not secure.

---

[1]*See*    https://www.databreaches.net/updating-capturerx-incident-impacted-almost-2-mllion-people/ (last visited May 28, 2021).

000042/01330328_1

5.      Defendants had obligations created by federal law, state law, implied contract, industry standards, common law, and representations made to Plaintiffs and Class members, to keep their PII and PHI confidential and to protect it from unauthorized access and disclosure.

6.      Ms. Camacho, on behalf of T.C., and Class members provided their PII and PHI to Defendants with the reasonable expectation that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access.

7.      Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and data breaches in the healthcare industry preceding the date of the Data Breach.

8.      As a result of Defendants' failure to protect the consumer information they were entrusted with, T.C. and Class members have been exposed to and/or are at a significant risk of identity theft, financial fraud, and other identity-related fraud into the indefinite future. T.C. and Class members have also lost the inherent value of their PII/PHI. This harm was compounded by Defendants' failure to ensure that their Customers received proper and timely notification of the Data Breach. In turn, Ms. Camacho and similarly situated parents and guardians suffered emotional distress—which caused physical manifestations—and injury in the form of loss of time, as they were the caretakers responsible for attempting to manage the fallout from the Data Breach.

## **PARTIES**

9.      T.C. is the minor child of Ms. Camacho. He is a citizen and resident of the state of California.

10.      Defendants obtained and continue to maintain T.C.'s PII/PHI and have a legal duty and obligation to protect that PII/PHI from unauthorized access and disclosure. Ms. Camacho would not have entrusted T.C.'s PII/PHI to Rite Aid had she known that its third-party administrator (*i.e.*, CaptureRx) entrusted with T.C.'s PII/PHI failed to maintain adequate data security. T.C.'s PII/PHI was compromised and disclosed as result of the subject Data Breach.

11.      Ms. Camacho was required to provide T.C.'s PII/PHI to Rite Aid as a predicate to receiving healthcare services. T.C.'s PII/PHI was in turn provided to CaptureRx in connection with its services to Rite Aid.

12.     On or about May 5, 2021, Ms. Camacho received notice from CaptureRx that T.C.'s PII/PHI had been improperly accessed and/or obtained by unauthorized third parties. This notice indicated that T.C.'s PII/PHI, including his first name, last name, date of birth, and prescription information, was compromised as a result of the Data Breach.[2]

13.     As the guardian and caretaker for T.C., Ms. Camacho was the party responsible for mitigating the damages resulting from the Data Breach. Ms. Camacho made reasonable efforts to mitigate its impact after receiving the notification letter, including but not limited to maintaining credit monitoring services and reviewing credit report websites such as freecreditreport.com and creditkarma.com for any indications of actual or attempted identity theft or fraud with regard to T.C. As a result, she has suffered injury. Specifically, Ms. Camacho has spent approximately eight hours since the Data Breach to present dealing with issues related to the Data Breach. She will continue to expend time monitoring T.C.'s credit and other identity-related information. This is valuable time Ms. Camacho otherwise would have spent on other activities, including but not limited to work and/or recreation.

14.     As part of her best efforts to safeguard T.C.'s data, and since T.C. was not offered credit monitoring and identity theft protection services by Defendants, Ms. Camacho has elected to maintain two separate credit monitoring and identity theft protection services on a monthly basis for approximately $29.99 per service. Ms. Camacho plans to continue purchasing credit monitoring and identity theft protection services on an ongoing basis to protect her and her son from identity theft and fraud.

15.     T.C. has suffered actual injury from having his PII/PHI compromised as a result of the Data Breach, including, but not limited to (a) damage to and diminution in the value of his PII/PHI, a form of property that Defendants obtained from Plaintiffs; (b) violation of his privacy rights; and (c) imminent and impending injury arising from the increased risk of identity theft and fraud for years to come.

16.     Ms. Camacho has suffered actual injury from having T.C.'s PII/PHI compromised as a result of the Data Breach. For example, Ms. Camacho has suffered loss of her personal time—time

---

[2] *See* May 5, 2021 Notice of Security Incident, attached as **Exhibit A.**

000042/01330328_1

she would have spent on other matters—and emotional distress as a result of the release of T.C.'s PII/PHI, which she believed would be protected from unauthorized access and disclosure.

17.     Identity theft exacts a severe emotional toll on its victims. The 2017 Identity Theft Center[3] survey evidences the emotional suffering experienced by victims of identify theft:

- 75% of respondents reported feeling severely distressed;
- 67% reported anxiety;
- 66% reported feelings of fear related to personal financial safety;
- 37% reported fearing for the financial safety of family members;
- 24% reported fear for their physical safety;
- 15.2% reported a relationship ended or was severely and negatively impacted by the identify theft; and
- 7% reported feeling suicidal.

18.     Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

- 48.3% of respondents reported sleep disturbances.
- 37.1% reported an inability to concentrate / lack of focus;
- 28.7% reported they were unable to go to work because of physical symptoms;
- 23.1% reported new physical illnesses (aches and pains, heart palpitations, sweating, stomach issues); and
- 12.6% reported a start or relapse into unhealthy or addictive behaviors.[4]

19.     Ms. Camacho has suffered anxiety about unauthorized parties viewing, selling, and/or using T.C.'s PII/PHI for purposes of identity theft and fraud. Ms. Camacho is severely distressed about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach. She has experienced sleep disturbances and the inability to concentrate or focus because she fears the financial and physical safety of her family. She is also extremely concerned

---

[3] Identity Theft Resource Center, Identity Theft: The Aftermath 2017, available at http://www.idtheftcenter.org/images/page-docs/Aftermath_2017.pdf (last visited June 3, 2021).
[4] *Id.*

000042/01330328_1

about T.C.'s financial security and that his credit may not be at its best for major life events as a result of the Data Breach.

20.     Additionally, Ms. Camacho has suffered actual injury as a result of the Data Breach, as she has spent considerable time and anticipates spending considerable time on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative Class members, and minimal diversity exists because putative Class members are citizens of a different state than Defendants.

22.     This Court has personal jurisdiction over Defendants because they are authorized to and regularly conduct business in California.

23.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

### Defendants and Their Privacy and Data Security Representations

24.      Founded in San Antonio, Texas, in 2000, CatpureRx is a health care technology and services company, and a leading provider of software and services to hospital, community health clinics, and other health care providers, including Rite Aid.

25.     Rite Aid is an American drugstore chain. It is ranked number 150 in the 2020 Fortune 500 list of the larges United States corporations by total revenue. It is the largest drugstore chain on the East Coast and the third largest in the United States. As of January 6, 2020, it had 2,464 locations.[5]

26.     In the course of providing their services, Defendants collect and maintain PII and PHI of their Customers, including their first name, last name, date of birth, address, telephone number, prescription information, and health insurance information.

27.     Plaintiffs were Customers of Defendants and, as a result, Ms. Camacho provided T.C.'s PHI/PHI to Defendants.

___

[5] *See* https://en.wikipedia.org/wiki/Rite_Aid (last visited May 27, 2021).

28.     Defendants are fully aware of the sensitive nature of Customers' PII and PHI stored on or processed through its systems.

29.     For example, CaptureRx's Privacy Policy states, in pertinent part:

**Information sharing**

CaptureRx will not sell, trade, rent, or voluntarily provide to others any personally identifiable information collected on our Website. We may, however, disclose such personally identifiable information when we believe in good faith that it is required to be disclosed to protect our rights, protect your safety or the safety of others, investigate fraud, by law or by an appropriate law enforcement or governmental authority.

Our Website includes links to other websites whose privacy practices may differ from those of CaptureRx. If you submit personal information to any of those websites, your information is governed by their privacy policies. We encourage you to carefully read the privacy policy of any website you visit.

We also may from time to time engage third parties to track and analyze non-personally identifiable usage and volume statistical information from visitors to our Website to help us administer our Website and improve its quality. Such third parties may use cookies to help track visitor behavior. Such cookies will not be used to associate individual Website visitors to any personal information. Except as otherwise set forth herein, all data collected by such third parties on our behalf is used only to provide us with information on Website usage and is not shared with any other third parties.

**Information security**

CaptureRx takes various security measures to protect information received online. Access to information stored on our servers is restricted to CaptureRx employees or agents who need to know such information to perform a specific job on CaptureRx's behalf.

Although CaptureRx makes a genuine effort to ensure the security of activities conducted on this Website, no transmission over the Internet, or method of electronic storage, is completely secure. Accordingly, CaptureRx cannot and does not guarantee that any activities conducted on this Website will be absolutely secure.

**Information storage**

Information may be copied, stored, and retained on our database servers or as part of our normal backup processes. Servers and backup information is subject to physical, electronic, and managerial security measures and access is restricted to authorized IT associates.

Our Website includes social media widgets, such as the share this button or interactive mini-programs that run on our Website. These features may collect your IP address, which page you are visiting on our Website, and may set a cookie to enable the feature to function properly. Social media features and widgets are either hosted by a third party or hosted directly on our

Website. Your interactions with these features are governed by the privacy policy of the company providing it.[6]

30.     Rite Aid's Privacy Policy states that it collects certain PII from consumers, including: contact information, such as name, phone number, postal address and email address; demographic information, such as date of birth and gender; payment card information, including card number, expiration date, and security code; bank account number; information stored in or associated with Rite Aid accounts, including username and password; transaction information, including online order history; information related to prescription management (such as medical information and prescription numbers); comments, product reviews and other content provided through our Sites; information provided to receive discounts or coupons, including through wellness+ accounts; geolocation data; and information about use of our Sites (such as content shared with others), which we may associate with Rite Aid account data.[7] The Privacy Policy is provided to every Customer upon request and is posted on Rite Aid's websites.

31.     Rite Aid makes representations to its Customers regarding its data security practices. Its Privacy Policy specifically states: "We may use the personal information we obtain to:…comply with and enforce applicable legal requirements, relevant industry standards, contractual obligations and our policies, including this Privacy Policy, our HIPAA Notice of Privacy Practices, and our Terms and Conditions."[8] It further states that it "maintain[s] administrative, technical, and physical safeguards designed to protect personal information against accidental, unlawful, or unauthorized destruction, loss, alteration, access, disclosure, or use."[9]

32.     Rite Aid's HIPAA Notice of Privacy Practices ("HIPAA Notice") provides that it collects PHI from Customers for treatment, to obtain payment for products and services, and to carry out health care operations.[10]

---

[6]*See* https://www.capturerx.com/privacy-policy/ (last visited May 28, 2021); *see also* https://www.capturerx.com/privacy-notice/ (CaptureRx Privacy Notice for California residents) (last visited May 28, 2021).
[7]*See* https://www.riteaid.com/legal/privacy-policy (last visited May 25, 2021).
[8] *Id.*
[9] *Id.*
[10]*See* https://www.riteaid.com/legal/patient-privacy-policy (last visited May 25, 2021).

000042/01330328_1

33.     Recognizing the sensitivity of the health information it maintains, Rite Aid's HIPAA Notice states that it is "required by law to maintain the privacy and confidentiality of protected health information and to provide you with a notice of Privacy Practice's including our legal duties with respect to protected health information."[11]

34.     Rite Aid's HIPAA Notice specifically sets forth expectations for Rite Aid's behavior in the event of a data breach, providing that it is "required by law to notify you following a breach of your unsecured protected health information."[12]

35.     By obtaining, collecting, using, and deriving a benefit from T.C.'s and Class member's PII/PHI, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting T.C.'s and Class members' PII/PHI from disclosure.

36.     Ms. Camacho, on behalf of T.C., and Class members have taken reasonable steps to maintain the confidentiality of their PII/PHI.

37.     Plaintiffs and Class members relied on Defendants to keep the PII/PHI of its Customers confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

**Defendants' Knowledge That They Were and Are Targets of Cyber Threats**

38.     Defendants knew they were a prime target for hackers given the significant amount of sensitive Customer PII/PHI that they collect and store.

39.     Experts studying cyber security routinely identify healthcare providers as being particularly vulnerable to cyberattacks because of the value of the PII and PHI which they collect and maintain.

40.     Defendants' knowledge is underscored by the massive number of data breaches, including those perpetrated against the healthcare sector, that have occurred in recent years. Over 41 million patient records were breached in 2019, with a single hacking incident affecting close to 21 million records.[13] Healthcare data breaches in 2019 almost tripled those the healthcare industry

---

[11]*Id.*
[12] *Id.*
[13]https://www.fiercehealthcare.com/tech/number-patient-records-breached-2019-almost-tripled-from-2018-as-healthcare-faces-new-threats (last visited May 28, 2021).

experienced in 2018 when 15 million patient records were affected by breach incidents, according to a report from Protenus and DataBreaches.net.[14]

41.   Protenus, a healthcare compliance analytics firm, analyzed data breach incidents disclosed to the U.S. Department of Health and Human Services or the media during 2019, finding there has been an alarming increase in the number of breaches of patient privacy since 2016, when there were 450 security incidents involving patient data.[15]   In 2019, that number jumped to 572 incidents, which is likely an underestimate, as two of the incidents for which there were no data affected 500 dental practices and clinics and could affect significant volumes of patient records. There continues to be at least one health data breach per day.[16]

42.   Despite knowing the prevalence of these healthcare data breaches, Defendants failed to prioritize data security by adopting reasonable data security measures to prevent and detect unauthorized access to their highly sensitive systems and databases. Defendants had the resources to prevent a breach, but neglected to adequately invest in data security, despite the growing number of well-publicized data breaches affecting the healthcare industry.

43.   Defendants failed to undertake adequate analyses and testing of their own systems, training of their own personnel, and other data security measures to ensure that similar vulnerabilities were avoided or remedied and that Plaintiffs' and Class members' PII and PHI was protected.

44.   The PII/PHI of minors was compromised in the Data Breach. Ms. Camacho is the parent of T.C., a minor child. She was required to provide T.C.'s PII/PHI to Rite Aid, which was obtained and maintained by Defendants, which Defendants had a duty to secure and safeguard.

45.   Children's data is particularly attractive to data thieves and can have long-standing effects on the child's financial history and identify. Specifically:

> The theft of a child's identity is lucrative to a cyber-criminal because it can remain undetected for years, if not decades. Without regular monitoring, a child's identity that has been stolen may not be discovered until they are preparing to go to college and start applying for student loans or get their first credit card. By then, the damage is

---

[14]*Id.*; *see also* https://www.protenus.com/resources/2020-breach-barometer/ (last visited May 28, 2021).
[15]*Id.*
[16]*Id.*
000042/01330328_1

done and the now young adult will need to go through the pain of proving that their identity was indeed stolen.[17]

46.     In 2011, Carnegie Mellon University's CyLab reported "the rate of child identity theft is 51 times higher than for adults (whose data sets cost about $10 - $25 on dark web markets)."[18]

47.     By early 2018, it became well known that the data of infants was being sold on the dark web. As of 2018, the cost of an infant's data was approximately $300 in Bitcoin, which would "provide cybercriminals access to a clean credit history."[19]

48.     As instructed by the FTC, a child's Social Security number can be used by identity thieves to apply for government benefits, open bank and credit card accounts, apply for a loan or utility service, or rent a place to live.[20]

49.     As one cyber-security author further explained, the impact of the use of children's information is further exacerbated by the fact that there are few checks on using a child's data to initially obtain credit and slowly increase it over time—all while being undetected by the child and the parents.[21]   Thus, "[t]he problem goes unnoticed for years—possibly decades—before the child goes to apply for student loans, open their first credit card, or buy their first car."[22]

50.     Accordingly, minor children like T.C. and the Nationwide Minor and California Minor Subclass members are a particularly vulnerable and defenseless group of Customers of Defendants, and are more significantly damaged and imminently threatened to be damaged as a result of Defendants' misconduct described herein because, without limitation, they are especially: (1) attractive targets to cyber criminals; (2) vulnerable to fraudulent activity and identity theft with respect to their stolen PII; (3) defenseless to protect themselves from such theft, fraud, or identity theft; and

---

[17]Avery Wolfe, *How Data Breaches Affect Children*, AXIOM Cyber Solutions (March 15, 2018), available at https://axiomcyber.com/data-breach/how-data-breaches-affect-children/ (last visited May 28, 2021).
[18]Selena Larson, *Infant Social Security Numbers Are for Sale on the Dark Web*, CNN Bus. (Jan. 22, 2018), https://money.cnn.com/2018/01/22/technology/infant-data-dark-web-identity-theft/index.html (last visited May 28, 2021).
[19] *Id.*
[20] *Child Identity Theft*, FTC: Consumer Info., https://www.consumer.ftc.gov/articles/how-protect-your-child-identity-theft (last visited May 28, 2021).
[21] *See* Emily Wilson, *The Worrying Trend of Children's Data Being Sold on the Dark Web*, TNW (Feb. 23, 2019), https://thenextweb.com/news/children-data-sold-the-dark-web (last visited May 28, 2021).
[22] *Id.*

(4) subject to prolonged surreptitious fraud and identity theft following the theft of their data, all of which is well documented in academic and government-issued materials, by experts in the field, and by the media.

**The Data Breach**

51. According to the Notice that CaptureRx sent victims of the Data Breach, on February 11, 2021, CaptureRx became aware of unusual activity involving certain of its electronic files.[23] Following this, CaptureRx began an investigation into this activity and assessed the security of its systems. On February 19, 2021, the investigation determined that certain files were accessed and acquired on February 6, 2021, without authorization. According to CaptureRx, upon learning of the Data Breach, it "moved quickly to investigate and respond." On or about March 19, 2021, CaptureRx confirmed the full scope of affected individuals and associated entities to which the information related, and determined that the subject files contained first name, last name, date of birth, and prescription information for certain patients of healthcare providers for whom CaptureRx provides services, including Rite Aid.[24]

52. In other words, the Notice conceded that PII was targeted and viewed or removed (*i.e.*, stolen) from CaptureRx's systems. CaptureRx disclosed to the Office of the Main Attorney General that the cause of the Data Breach was an "[e]xternal system breach (hacking)."[25]

53. CaptureRx advised its Customers, including Plaintiffs, to "remain vigilant against incidents of identity theft and fraud, to review account statements and explanation of benefit forms, and to monitor free credit reports for suspicious activity and to detect errors."[26] However, neither Defendant offered Plaintiffs and Class members credit monitoring and identity theft protection in connection with the Data Breach.

---

[23] *See* Ex. A; *see also* https://apps.web.maine.gov/online/aeviewer/ME/40/e8aa9ab4-e354-44db-b730-e002aca8955d.shtml (last visited May 27, 2021).
[24] *See* Ex. A.
[25] https://apps.web.maine.gov/online/aeviewer/ME/40/e8aa9ab4-e354-44db-b730-e002aca8955d.shtml (last visited May 27, 2021).
[26] *See* Ex. A.

54.     Since there are approximately 1,919,938 known victims affected by the Data Breach, including T.C,[27]

55.     Because of the nature of the PII/PHI stored or processed by Defendants, Ms. Camacho understand that all categories of PII/PHI were subject to unauthorized access and exfiltration, theft, or disclosure. In other words, criminals would have no purpose for hacking CaptureRx other than to exfiltrate or steal the coveted PII/PHI stored or processed by Defendants.

56.     Despite having knowledge of the Data Breach no later than February 19, 2021, it was not until on or about March 30, 2021, that CaptureRx began notifying its healthcare providers, including Rite Aid, of the incident. CaptureRx did not notify impacted Customers, including Ms. Camacho, until May 5, 2021 or later.[28]  Rite Aid has not notified Ms. Camacho of the Data Breach.

57.     Ms. Camacho did not receive notice of the Data Breach until May 5, 2021, more than two and a half months following CaptureRx's alleged discovery of the Data Breach, and more than one month following Rite Aid's alleged discovery of the Data Breach.

58.     As a result of Defendants' dilatory response to the Data Breach, Ms. Camacho and Class members have had to spend time, and will continue to spend a significant amount of time into the future, taking measures to protect themselves (and their minor children) from identity theft, fraud, and other identity-related crimes.

59.     Defendants are responsible for allowing the Data Breach to occur because they failed to implement and maintain any reasonable safeguards and failed to comply with industry-standard data security practices, contrary to the representations made in various privacy statements and policies and their explicit and implied agreements with their Customers, including Plaintiffs and Class members.

60.     As a result of Defendants' failure to protect the sensitive PII/PHI they were entrusted with, T.C. and Class members are at a significant risk of identity theft, financial fraud, and other identity-related fraud into the indefinite future. T.C. and Class members have also lost the inherent value of their PII/PHI.

---

[27] https://apps.web.maine.gov/online/aeviewer/ME/40/e8aa9ab4-e354-44db-b730-e002aca8955d.shtml (last visited May 27, 2021).
[28] *Id.*

000042/01330328_1

61.     Ms. Camacho provided T.C.'s PII/PHI to Rite Aid, and Class members provided their PII/PHI to Rite Aid, with the expectation and understanding that Defendants would adequately protect and store the data. Ms. Camacho and Class members would not have entrusted the PII/PHI to Rite Aid had they known that its third-party administrator (*i.e.*, CaptureRx) entrusted with the PII/PHI failed to maintain adequate data security.

**Defendants Failed to Comply with Statutory and Regulatory Obligations**

62.     Defendants had obligations created by industry standards, federal law, state law, and common law to keep T.C. and Class members' PII/PHI confidential and to protect it from unauthorized access and disclosure.

63.     Defendants are covered entities and/or business associates pursuant to the Health Insurance Portability and Accountability Act ("HIPAA"), 45 C.F.R. § 160.102; accordingly, Defendants must comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A through E. HIPAA's Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information") establishes national standards for the protection of health information. HIPAA's Security Rule ("Security Standards for the Protection of Electronic Protected Health Information") establishes national security standards for the protection of health information that is held or transferred in electronic form. *See* 42 C.F.R. §§ 164.302-164.318.

64.     HIPAA limits the permissible uses of "protected health information" and prohibits the unauthorized disclosure of "protected health information." 45 C.F.R. § 164.502. HIPAA requires that covered entities implement appropriate administrative, technical, and physical safeguards for this information and requires that covered entities reasonably safeguard protected health information from any intentional or unintentional use or disclosure that is in violation of the standards, implementation specifications or other requirements of that subpart. *See* 45 C.F.R. § 164.530(c).

65.     HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

66.     Defendants are covered entities and/or business associates pursuant to the Health Information Technology Act ("HITECH").[29] *See* 42 U.S.C. § 17921, 45 C.F.R. § 160.103.

67.     HIPAA and HITECH provide guidelines for the standard of procedure dictating how patient medical information should be kept private.

68.     HIPAA and HITECH obligated Defendants to implement technical policies and procedures for electronic information systems that maintain electronic protected health information so that such systems were accessible only to those persons or software programs that had been granted access rights and who have a working need to access and view the information. *See* 45 C.F.R. § 164.312(a)(1); *see also* 42 U.S.C. §17902.

69.     HIPAA and HITECH also obligated Defendants to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

70.     The Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), issues annual guidance documents on the provisions in the HIPAA Security Rule. "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." *See* US Department of Health & Human Services, Security Rule Guidance Material.[30] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI." *See* US Department of Health & Human Services, Guidance on Risk Analysis.[31]

---

[29] HIPAA and HITECH work together to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.
[30] https://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last visited May 27, 2021).
[31] https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html (last visited May 27, 2021).

000042/01330328_1

71.     Should a health care provider experience an unauthorized disclosure, it is required to conduct a Four Factor Risk Assessment (HIPAA Omnibus Rule). This standard requires, "A covered entity or business associate must now undertake a four-factor risk assessment to determine whether or not PHI has been compromised and overcome the presumption that the breach must be reported. The four-factor risk assessment focuses on:

(1) the nature and extent of the PHI involved in the incident (*e.g.*, whether the incident involved sensitive information like social security numbers or infectious disease test results);

(2) the recipient of the PHI;

(3) whether the PHI was actually acquired or viewed; and

(4) the extent to which the risk that the PHI was compromised has been mitigated following unauthorized disclosure (*e.g.*, whether it was immediately sequestered and destroyed)."[32]

72.     The HIPAA Breach Notification Rule, 45 CFR §§ 164.400-414, requires HIPAA covered entities and their business associates to provide notification following a breach of unsecured protected health information.

73.     Defendants failed to provide proper notice to Plaintiffs of the disclosure and failed to conduct or improperly conducted the four-factor risk assessment following the unauthorized disclosure.

74.     In addition, Defendants were prohibited by the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

75.     Moreover, federal agencies have issued recommendations and guidelines to temper data breaches and the resulting harm to individuals and financial institutions. For example, the FTC has issued numerous guides for businesses highlighting the importance of reasonable data security

---

[32] 78 Fed. Reg. 5641-46; *see also* 45 C.F.R. § 164.304.

practices. According to the FTC, the need for data security should be factored into all business decision-making.[33]

76.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[34] Among other things, the guidelines note businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[35]

77.     Additionally, the FTC recommends that companies limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.[36]

78.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.[37]

---

[33] *Start with Security, A Guide for Business*, FTC, https://www.ftc.gov/tips-advice/business-center/guidance/start-security-guide-business (last visited May 28, 2021).
[34] *Protecting Personal Information: A Guide for Business*, FTC, https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business (last visited May 28, 2021).
[35] *Id.*
[36] *Start with Security*, *supra* n.33.
[37] *Privacy and Security Enforcement: Press Releases*, FTC, https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-security-enforcement (last visited May 28, 2021).

79.     Defendants also failed to comply with commonly accepted industry standards for data security. Security standards commonly accepted among businesses that store PII/PHI using the internet include, without limitation:

        a.     Maintaining a secure firewall configuration;

        b.     Maintaining appropriate design, systems, and controls to limit user access to certain information as necessary;

        c.     Monitoring for suspicious or irregular traffic to servers;

        d.     Monitoring for suspicious credentials used to access servers;

        e.     Monitoring for suspicious or irregular activity by known users;

        f.     Monitoring for suspicious or unknown users;

        g.     Monitoring for suspicious or irregular server requests;

        h.     Monitoring for server requests for PII;

        i.     Monitoring for server requests from VPNs; and

        j.     Monitoring for server requests from Tor exit nodes.

80.     Defendants are also required by various states' laws and regulations to protect T.C.'s and Class members' PII/PHI and to handle any breach of the same in accordance with applicable breach notification statutes.

81.     In addition to their obligations under federal and state laws, Defendants owed a duty to Plaintiffs and Class members whose PII/PHI were entrusted to Defendants to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII/PHI in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed a duty to Plaintiffs and Class members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that their systems and networks adequately protected the PII/PHI of Plaintiffs and Class members.

82.     Defendants owed a duty to Plaintiffs and Class members whose PII/PHI was entrusted to Defendants to design, maintain, and test their systems to ensure that the PII/PHI in Defendants' possession was adequately secured and protected.

83.     Defendants owed a duty to Plaintiffs and Class members whose PII/PHI was entrusted to Defendants to create and implement reasonable data security practices and procedures to protect PII/PHI in their possession.

84.     Defendants owed a duty to Plaintiffs and Class members whose PII/PHI was entrusted to Defendants to implement processes that would detect a breach of their data security systems in a timely manner.

85.     Defendants owed a duty to Plaintiffs and Class members whose PII/PHI was entrusted to Defendants to act upon data security warnings and alters in a timely fashion.

86.     Defendants owed a duty to Plaintiffs and Class members whose PII/PHI was entrusted to Defendants to disclose if their systems and data security practices were inadequate to safeguard individuals' PII from theft because such an inadequacy would be a material fact in the decision to entrust PII to Defendants.

87.     Defendants owed a duty to Plaintiffs and Class members whose PII/PHI was entrusted to Defendants to disclose in a timely and accurate manner when data breaches occurred.

88.     Defendants owed a duty of care to Plaintiffs and Class members because they were foreseeable and probable victims of any inadequacy in their affirmative development of the systems to maintain PII/PHI and in their affirmative maintenance of those systems.

89.     In this case, Defendants were fully aware of their obligations to use reasonable measures to protect the PII/PHI of their Customers, acknowledging as much in their various privacy statements and policies. Defendants also knew they were a target for hackers. But despite understanding the consequences of inadequate data security, Defendants failed to comply with industry-standard data security requirements.

90.     Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Customers' PII/PHI constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45, and various state consumer protection and data breach statutes.

**The Value of PII/PHI and Effect of the Data Breach**

91.     It is well known that PII/PHI is an invaluable commodity and a frequent target of hackers.

000042/01330328_1

92.     According to Javelin Strategy & Research, in 2017 alone over 16.7 million individuals were affected by identity theft, causing $16.8 billion to be stolen.[38]

93.     Consumers place a high value not only on their PII/PHI, but also on the privacy of that data. This is because identity theft causes "significant negative financial impact on victims" as well as severe distress and other strong emotions and physical reactions.

94.     PII/PHI is such a valuable commodity to identity thieves that, once the information has been compromised, criminals often trade the information on the "cyber black-market" for years. There is a strong probability that entire batches of stolen information have been dumped on the black market and will be again in the future, meaning Plaintiffs and Class members are at an increased risk of fraud and identity theft for many years to come. Thus, Plaintiffs and Class members must vigilantly monitor their financial and medical accounts for the foreseeable future.

95.     There may be a significant time lag between when PII/PHI is stolen and when it is actually misused. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[39]

96.     The risk of identity theft is particularly acute where detailed personal information is stolen, such as the PII/PHI that was compromised in the Data Breach.

97.     The cyber black-market demonstrates that PII/PHI is a valuable property right.[40] Moreover, its value is axiomatic, considering the value of Big Data in corporate America and the

---

[38] Javelin Strategy & Research, *Identity Fraud Hits All Time High With 16.7 Million U.S. Victims in 2017, According to New Javelin Strategy & Research Study* (Feb. 6, 2018), available at https://www.javelinstrategy.com/press-release/identity-fraud-hits-all-time-high-167-million-us-victims-2017-according-new-javelin (last visited May 28, 2021).
[39] U.S. Government Accountability Office, *Report to Congressional Requesters* (June 2007), https://www.gao.gov/assets/gao-07-737.pdf (last visited May 28, 2021).
[40] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

000042/01330328_1

consequences of cyber thefts, which include heavy prison sentences. This obvious risk/reward analysis illustrates that PII has considerable market value.

98.   The value of PII, including PHI, is underscored by the growing number of legitimate marketplaces allowing consumers to monetize their PII.[41]

99.   As the result of Data Breach, Plaintiffs and Class members have suffered or will suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to the following:

- identity theft and fraud resulting from theft of their PII/PHI;
- costs associated with the detection and prevention of identity theft and unauthorized use of their online accounts, including financial accounts;
- losing the inherent value of their PII/PHI;
- losing the value of Defendants' explicit and implicit promises of adequate data security;
- costs associated with purchasing credit monitoring and identity theft protection services;
- unauthorized access to and misuse of their online accounts;
- unauthorized charges and loss of use of and access to their financial account funds and costs associated with inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit;
- lowered credit scores resulting from credit inquiries following fraudulent activities;
- costs associated with time spent and the loss of productivity or enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including discovering fraudulent charges, cancelling and reissuing cards, addressing other varied instances of identity theft – such as credit

---

[41]Markets for personal data, Project VRM, Harvard University, https://cyber.harvard.edu/ projectvrm/VRM_Development_Work#Markets_for_personal_data (last visited May 28, 2021).

000042/01330328_1

cards, bank accounts, loans, government benefits, and other services procured using the stolen PII/PHI, purchasing credit monitoring and identity theft protection services, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach;

- the continued imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being in the possession of one or more unauthorized third parties; and

- continued risk of exposure to hackers and thieves of their PII/PHI, which remains in Defendants' possession and is subject to further breaches so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiffs and Class members.

100.    Additionally, Plaintiffs and Class members place significant value in data security. According to a recent survey conducted by cyber-security company FireEye, approximately 50% of consumers consider data security to be a main or important consideration when making purchasing decisions and nearly the same percentage would be willing to pay more in order to work with a provider that has better data security. Likewise, 70% of consumers would provide less personal information to organizations that suffered a data breach.[42]

101.    One study on website privacy determined that U.S. consumers valued the restriction of improper access to their personal information – the very injury at issue here – between $11.33 and $16.58 per website. The study also determined that "[a]mong U.S. subjects, protection against errors, improper access, and secondary use of personal information is worth US$30.49 – 44.62."  This study was done in 2002, almost twenty years ago. The sea-change in how pervasive the Internet is in everyday lives since then indicates that these values—when associated with the loss of PII/PHI to bad actors—would be much higher today.

102.    The cost of hosting or processing Customers' PII/PHI on or through Defendants' computer data and storage systems includes things such as the actual cost of the servers and employee hours needed to process said transactions. One component of the cost of using these services is the

---

[42]FireEye, *Beyond the Bottom Line: The Real Cost of Data Breaches* (May 11, 2016), https://www.fireeye.com/blog/executive-perspective/2016/05/beyond_the_bottomli.html (last visited May 28, 2021).

000042/01330328_1

explicit and implicit promises Defendants made to protect Customers' PII/PHI. Because of the value consumers like Plaintiffs and the Class members place on data privacy and security, companies with robust data security practices can command higher prices than those who do not. Indeed, if consumers did not value their data security and privacy, companies like Defendants would have no reason to tout their data security efforts to their actual and potential Customers.

103.    Had the victims of the Data Breach, including Ms. Camacho, known the truth about Defendants' data security practices—that Defendants would not adequately protect and store their data—they would not have entrusted PII/PHI to Defendants and would not have paid for, or would have paid less for, healthcare services.

104.    T.C. and Class members are at an imminent risk of fraud, criminal misuse of their PII/PHI, and identity theft for years to come as result of the Data Breach and Defendants' deceptive and unconscionable conduct.

## CLASS ACTION ALLEGATIONS

105.    Pursuant to Federal Rule of Civil Procedure 23(b)(1), (b)(2) and (b)(3), Plaintiffs seeks certification of the following Nationwide Class and Nationwide Minor Subclass:

106.    **Nationwide Class:** All individuals in the United States of America whose PII or PHI was compromised in the Data Breach.

107.    **Nationwide Minor Subclass:** All minor children in the United States of America whose PII or PHI was compromised in the Data Breach, as well as all adult individuals in the United States of America who provided PII or PHI to Defendants while they were minor children and had their PII/PHI compromised in the Data Breach.

108.    The Nationwide Class asserts claims against Defendants for negligence (Count 1), negligence *per se* (Count 2), declaratory judgment (Count 3), breach of confidence (Count 4), breach of express contract (Count 5), breach of implied contract (Count 6), intrusion upon seclusion (Count 7), and violation of California's Unfair Competition Law (Count 8).

109.    Pursuant to Federal Rules of Civil Procedure 23(b)(1), (b)(2) and (b)(3), Plaintiffs seek certification of California state claims in the alternative to the nationwide claims, as well as certification of claims for violations of the California Customer Records Act (Count 9) and the

California Consumer Privacy Act (Count 10), on behalf of two subclasses of California residents, defined as follows:

110.   **California Subclass**: All individuals in California whose PII or PHI was compromised in the Data Breach.

111.   **California Minor Subclass**: All minor children in California whose PII or PHI was compromised in the Data Breach, as well as all adult individuals in California who provided PII or PHI to Defendants while they were minor children and had their PII/PHI compromised in the Data Breach.

112.   The Nationwide Class, Nationwide Minor Subclass, California Subclass, and California Minor Subclass are collectively referred to herein as the "Class."

113.   Excluded from the Class are Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class are any judicial officer presiding over this matter, members of their immediate family, members of their judicial staff, and any judge sitting in the presiding court system who may hear an appeal of any judgment entered.

114.   **Risk of Inconsistent or Varying Adjudications. Fed. R. Civ. P. 23(b)(1).** While the exact number of Class members is unknown at this time, upon information and belief, there are at least hundreds of thousands of Class members; accordingly, there is significant risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants. For example, injunctive relief may be entered in multiple cases, but the ordered relief may vary, causing Defendants to have to choose between differing means of upgrading their data security infrastructure and choosing the court order with which it will comply. Class action status is also warranted because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

115.   **Numerosity. Fed. R. Civ. P. 23(a)(1).** Consistent with Rule 23(a)(1), the members of the Class are so numerous and geographically dispersed that the joinder of all members is impractical.

CaptureRx has admitted that nearly two million Customers across the country were affected by the Data Breach, and upon information and belief, there are at least hundreds of thousands of Class members.

116.    **Commonality and Predominance. Fed. R. Civ. P. 23(a)(2) and (b)(3).** This action involves common questions of law and fact that predominate over any questions affecting individual Class members. The common questions include, but are not limited to:

a.    Whether Defendants unlawfully used, maintained, lost, or disclosed Plaintiffs' and the Class members' PII/PHI;

b.    Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the PII/PHI compromised in the Data Breach;

c.    Whether Defendants truthfully represented the nature of their security systems, including their vulnerability to hackers;

d.    Whether Defendants' data security programs prior to and during the Data Breach complied with applicable data security laws and regulations;

e.    Whether Defendants' data security programs prior to and during the Data Breach were consistent with industry standards;

f.    Whether Defendants owed a duty to Class members to safeguard their PII/PHI;

g.    Whether Defendants breached their duty to Class members to safeguard their PII/PHI;

h.    Whether cyberhackers obtained, sold, copied, stored or released Class members' PII/PHI;

i.    Whether Defendants knew or should have known that their data security programs and monitoring processes were deficient;

j.    Whether the Class members suffered legally cognizable damages as a result of Defendants' misconduct;

k.    Whether Defendants' conduct was negligent;

l.    Whether Defendants' conduct was negligent *per se*;

m.    Whether Defendants breached implied contractual duties to Plaintiffs and Class members;

n.    Whether Rite Aid breached express contractual duties to Plaintiffs and Class members;

o.    Whether Defendants' acts, inactions, and practices complained of herein amount to acts of intrusion upon seclusion under the law;

p.    Whether Defendants' acts, inactions, and practices complained of herein amount to breaches of confidence;

q.    Whether Defendants failed to provide accurate and complete notice of the Data Breach in a timely manner;

r.    Whether Defendants' failure to secure Plaintiffs' and Class members' PII/PHI in the manner alleged violated federal laws, state laws, or industry standards; and

s.    Whether the Class members are entitled to damages, treble damages, civil penalties, punitive damages, and/or injunctive relief.

117.    **Typicality. Fed. R. Civ. P. 23(a)(3).**  Plaintiffs' claims are typical of other Class members' claims because Plaintiffs and Class members were subjected to the same allegedly unlawful conduct and damaged in the same way.

118.    **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiffs are adequate representatives of the Class. Plaintiffs are members of the Class and the Subclasses. Plaintiffs have no conflicts of interest with the Class. Plaintiffs' counsel are competent and experienced in litigating class actions, including extensive experience in data breach and privacy litigation and consumer protection claims. Plaintiffs intends to vigorously prosecute this case and will fairly and adequately protect the interests of the Class.

119.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs and Class members may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiffs and the Class members are relatively small compared to the burden

and expense required to individually litigate their claims against Defendants, and thus, individual litigation to redress Defendants' wrongful conduct would be impracticable. Individual litigation by each Class member would also strain the court system. Moreover, individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

120.    **Injunctive and Declaratory Relief. Fed. R. Civ. P. 23(b)(2).** Class certification is also appropriate under Rule 23(b)(2). Defendants, through their uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole. Moreover, Defendants continue to maintain their inadequate security practices, retain possession of Plaintiffs' and the Class members' PII/PHI, and have not been forced to change their practices or to relinquish PII/PHI by nature of other civil suits or government enforcement actions, thus making injunctive and declaratory relief a live issue and appropriate to the Class as a whole.

<div align="center">*        *        *</div>

<div align="center">

**<u>Count 1</u>**

**<u>NEGLIGENCE</u>**

<u>Against Defendants on Behalf of Plaintiffs, the Nationwide Class, and the Nationwide Minor</u>

<u>Subclass, or Alternatively, on behalf of Plaintiffs, the California Subclass,</u>

<u>and the California Minor Subclass</u>

</div>

121.    Plaintiffs repeat the allegations in paragraphs 1 – 120 in this Complaint, as if fully alleged herein.

122.    Defendants, in offering healthcare services to their Customers, knew that T.C.'s and Class members' sensitive PII/PHI would be stored or processed by Defendants' computer and data storage systems. Defendants, in fact, stored and/or processed this PII/PHI through and on their computer systems and/or databases.

123.    By collecting, storing, and using this data, Defendants had a duty of care to Plaintiffs and Class members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting this PII/PHI in Defendants' possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. More specifically, this duty included, among other things: (a) designing, maintaining, and testing Defendants' security systems and data storage architecture to ensure that T.C.'s and Class members' PII/PHI was adequately secured and protected; (b) implementing processes that would detect an unauthorized breach of Defendants' security systems and data storage architecture in a timely manner; (c) timely acting on all warnings and alerts, including public information, regarding Defendants' security vulnerabilities and potential compromise of the PII/PHI of T.C. and Class members; (d) maintaining data security measures consistent with industry standards and applicable state and federal law; and (e) timely and adequately informing Plaintiffs and Class members if and when a data breach occurred notwithstanding undertaking (a) through (d) above.

124.    Defendants had common law duties to prevent foreseeable harm to Plaintiffs and Class members. These duties existed because Plaintiffs and Class members were the foreseeable and probable victims of any inadequate security practices in Defendants' affirmative collection of Customers' PII/PHI. In fact, not only was it foreseeable that Plaintiffs and Class members would be harmed by the failure to protect their PII/PHI because hackers routinely attempt to steal such information and use it for nefarious purposes, but Defendants also knew that more likely than not, Plaintiffs and other Class members would be harmed by such theft.

125.    Defendants had a duty to monitor, supervise, control, or otherwise provide oversight to safeguard the PII/PHI that was collected, stored, and processed by Defendants' computer and data storage systems.

126.    Defendants' duties to use reasonable security measures also arose as a result of the special relationship that existed between Defendants, on the one hand, and Plaintiffs and Class members, on the other hand. The special relationship arose because Plaintiffs and Class members entrusted Defendants with PII/PHI by virtue of the healthcare services they obtained from Defendants. Defendants alone could have ensured that their security systems and data storage architecture were sufficient to prevent or minimize the Data Breach.

127.    Defendants' duties to use reasonable data security measures with regard to Plaintiffs and Class members' PHI also arose under HIPAA and HITECH, as stated herein.

128.    Defendants' duties to use reasonable data security measures also arose under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect PII. Various FTC publications and data security breach orders further form the basis of Defendants' duties. In addition, individual states have enacted statutes based upon the FTC Act that also created a duty.

129.    Defendants' duties to use reasonable data security measures also arose under the California Consumer Privacy Act ("CCPA"), Cal. Civ. Code § 1798.100, *et seq.*, which imposes a "duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information."

130.    Defendants' duties to use reasonable data security measures also arose under the California Consumer Records Acts ("CCRA"), Cal. Civ. Code §§ 1798.80, *et seq.*, which requires that any business that "owns, licenses, or maintains Personal Information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the Personal Information from unauthorized access, destruction, use, modification, or disclosure."

131.    The harm that has occurred is the type of harm the HIPAA, HITECH, FTC Act (and similar state statutes) and the CCPA and CCRA, were intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of Defendants' failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiffs and Class members.

132.    Defendants knew or should have known that their computer systems and data storage architecture were vulnerable to unauthorized access and targeting by hackers for the purpose of stealing and misusing confidential PII/PHI.

133.     Defendants knew or should have known that a breach of its systems and data storage architecture would inflict millions of dollars of damages upon Plaintiffs and the Class, and Defendants were therefore charged with a duty to adequately protect this critically sensitive information.

134.     Defendants breached the duties it owed to Plaintiffs and Class members described above and thus, was negligent. Defendants breached these duties by, among other things, failing to: (a) exercise reasonable care and implement adequate security systems, protocols and practices sufficient to protect the PII/PHI of Plaintiffs and Class members; (b) detect the breach while it was ongoing; (c) maintain security systems consistent with industry standards; (d) and timely informing its Customers of the fact and extent of the Data Breach. These failures constituted violations of the HIPAA, HITECH, FTC Act (and similar state statutes), as well as a breach of duties owed to Plaintiffs and Class members under the common law and CCPA and CCRA.

135.     Defendants also failed to exercise reasonable care and breached the duties it owed Plaintiffs and Class members when it provided the thieves and/or subsequent unauthorized recipients of the stolen information with additional time and cover to further purloin and re-sell the stolen PII/PHI belonging to T.C. and the Class members; provided the thieves and the purchasers and/or other subsequent unauthorized recipients with an opportunity to directly defraud T.C. and the Class; and failed to promptly notify Plaintiffs and Class members of the fact that their PII/PHI was compromised and in imminent jeopardy of falling further into the hands of cyber criminals.

136.     But for Defendants' wrongful and negligent breach of its duties owed to Plaintiffs and Class members, their PII/PHI would not have been compromised.

137.     As a direct and proximate result of Defendants' negligence, Plaintiffs and Class members have been injured and are entitled to damages in an amount to be proven at trial. T.C. has been injured, as his PII and PHI was breached as detailed herein, and Ms. Camacho has suffered injury in the form of lost time and emotional distress as the guardian and caretaker responsible for protecting her minor child. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII/PHI; illegal

1   sale of the compromised PII on the black market; mitigation expenses and time spent on credit

2   monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the

3   Data Breach investigating the nature of the Data Breach not fully disclosed by Defendants, reviewing

4   bank statements, payment card statements, and credit reports; expenses and time spent initiating fraud

5   alerts; decreased credit scores and ratings; lost work time; lost value of the PII; lost benefit of their

6   bargains and overcharges for services; and other economic and non-economic harm.

**Count 2**

**NEGELIGENCE *PER SE***

Against Defendants on Behalf of Plaintiffs, the Nationwide Class, the Nationwide Minor Subclass,
or Alternatively, on behalf of Plaintiffs, the California Subclass, and the California Minor Subclass

11      138.    Plaintiffs repeat the allegations in paragraphs 1 – 120 in this Complaint, as if fully

12   alleged herein, and assert this claim in the alternative to their negligence claim to the extent necessary.

13      139.    HIPAA and HITECH obligated Defendants to implement technical policies and

14   procedures for electronic information systems that maintain electronic protected health information

15   so that such systems were accessible only to those persons or software programs that had been granted

16   access rights and who have a working need to access and view the information. *See* 45 C.F.R. §

17   164.312(a)(1); *see also* 42 U.S.C. §17902.

18      140.    HIPAA and HITECH also obligated Defendants to implement policies and procedures

19   to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures

20   of electronic protected health information that are reasonably anticipated but not permitted by the

21   privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

22      141.    Pursuant to the FTC Act, 15 U.S.C. § 45, Defendants had a duty to provide fair and

23   adequate computer systems and data security to safeguard the PII/PHI of T.C. and Class Members.

24      142.    The FTC Act prohibits "unfair . . . practices in or affecting commerce," which the FTC

25   has interpreted to include businesses' failure to use reasonable measures to protect PII. The FTC

26   publications and orders described above also form part of the basis of Defendants' duty in this regard.

27   In addition, individual states have enacted statutes based upon the FTC Act, including California's

28   Unfair Competition Law, that also created a duty.

000042/01330328_1

143.    Defendants' duties to use reasonable data security measures also arose under the CCPA, Cal. Civ. Code § 1798.100, *et seq.*, which imposes a "duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information."

144.    Defendants' duties to use reasonable data security measures also arose under the CCRA, Cal. Civ. Code §§ 1798.80, *et seq.*, which requires that any business that "owns, licenses, or maintains Personal Information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the Personal Information from unauthorized access, destruction, use, modification, or disclosure."

145.    Defendants solicited, gathered, and stored PII/PHI of T.C. and the Class members to facilitate transactions which affect commerce.

146.    Defendants violated the HIPAA, HITECH, FTC Act (and similar state statutes, including California's Unfair Competition law), as well as the CCPA and the CCRA, by failing to use reasonable measures to protect PII/PHI of T.C. and the Class members and not complying with applicable industry standards, as described herein. Defendants' conduct was particularly unreasonable given the nature and amount of PII/PHI obtained and stored and the foreseeable consequences of a data breach on Defendants' systems.

147.    Defendants' violation of the HIPAA, HITECH, FTC Act (and similar state statutes, including California's Unfair Competition Law), as well as its violations of the CCPA and CCRA constitute negligence *per se*.

148.    Plaintiffs and the Class members are within the class of persons that the FTC Act and similar state statutes were intended to protect. Plaintiffs and Class members are within the class of persons that the CCPA and CCRA were intended to protect. Plaintiffs and Class members are also within the class of person that HIPAA and HITECH were intended to protect.

149.    The harm that occurred as a result of the breach is the type of harm the FTC Act and similar state statutes, the CCPA and CCRA, and HIPAA and HITECH were intended to guard against.

150.    The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures caused the same harm as that suffered by Plaintiffs and the Class members.

151.    As a direct and proximate result of Defendants' negligence *per se*, Plaintiffs and the Class members have suffered, and continue to suffer, damages arising from the Data Breach as described herein and as will be proven at trial. T.C. has been injured, as his PII and PHI was breached as detailed herein, and Ms. Camacho has suffered injury in the form of lost time and emotional distress as the guardian and caretaker responsible for protecting her minor child.

152.    Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII/PHI; illegal sale of the compromised PII/PHI on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach investigating the nature of the Data Breach not fully disclosed by Defendants; reviewing bank statements, payment card statements, and credit reports; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII/PHI; lost benefit of their bargains and overcharges for services; and other economic and non-economic harm.

## Count 3

## DECLARATORY JUDGMENT

Against Defendants on Behalf of Plaintiffs, the Nationwide Class, and the Nationwide Minor Subclass, or Alternatively, on behalf of Plaintiffs, the California Subclass, and the California Minor Subclass

153.    Plaintiffs repeat the allegations in paragraphs 1 – 120 in this Complaint, as if fully alleged herein.

154.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, the Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further

necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

155.    An actual controversy has arisen in the wake of the Data Breach regarding Defendants' present and prospective common law and other duties to reasonably safeguard its Customers' PII/PHI, and whether Defendants are currently maintaining data security measures adequate to protect T.C. and Class members from further data breaches that compromise their PII/PHI. T.C. and Class members remain at imminent risk that further compromises of their PII/PHI will occur in the future. This is true even if they are not actively using Defendants' services.

156.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.    Defendants continue to owe a legal duty to secure their Customers' PII/PHI and to timely notify consumers of a data breach under the federal law, common law, and various state statutes;

b.    Defendants continue to breach this legal duty by failing to employ reasonable measures to secure T.C. and Class members' PII/PHI.

157.    The Court also should issue corresponding prospective injunctive relief pursuant to 28 U.S.C. §2202, requiring Defendants to employ adequate security practices consistent with law and industry standards to protect its Customers' PII/PHI.

158.    If an injunction is not issued, Plaintiffs and Class members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach of Defendants. The risk of another such breach is real, immediate, and substantial. If another breach occurs, Plaintiffs and Class members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

159.    The hardship to Plaintiffs and Class members if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. Among other things, if another data breach occurs at Defendants, Plaintiffs and Class members will likely be subjected to fraud, identify theft, and other harms described herein. On the other hand, the cost to Defendants of complying with an

injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

160.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach of Defendants' computer and data storage systems, thus eliminating additional injuries that would result to Plaintiffs, Class members, and the hundreds of thousands of Customers of Defendants whose PII/PHI would be further compromised.

## Count 4

## BREACH OF CONFIDENCE

### Against Defendants on Behalf of Plaintiffs, the Nationwide Class, and the Nationwide Minor Subclass, or Alternatively, on behalf of Plaintiffs, the California Subclass, and the California Minor Subclass

161.    Plaintiffs repeat the allegations in paragraphs 1 – 120 in this Complaint, as if fully alleged herein.

162.    At all times during Plaintiffs and Class members' interactions with Defendants, Defendants were fully aware of the confidential and sensitive nature of the PII/PHI it was collecting from its Customers.

163.    As alleged herein and above, Defendants' relationship with Plaintiffs and the Class members was governed by terms and expectations that T.C.'s and the Class members' PII/PHI would be collected, stored, and protected in confidence, and would not be disclosed to the public or any unauthorized third parties.

164.    Ms. Camacho provided T.C.'s PII/PHI, and Class members provided their PII/PHI, which was both confidential and novel, to Defendants with the explicit and implicit understandings that Defendants would protect and not permit that PII/PHI to be disseminated to the public or any unauthorized parties.

165.    Ms. Camacho provided T.C.'s PII/PHI, and Class members provided their PII/PHI to Defendants with the explicit and implicit understandings that Defendants would take precautions to

protect the PII/PHI from unauthorized disclosure, such as following basic principles of encryption and information security practices.

166.    Defendants voluntarily received in confidence T.C. and the Class members' PII/PHI with the understanding that the PII/PHI was confidential and novel and, as such, would not be disclosed or disseminated to the public or any unauthorized third parties.

167.    Due to Defendants' failure to prevent, detect, and avoid the Data Breach from occurring by following best information security practices to secure T.C. and the Class members' PII/PHI, Defendants caused T.C.'s and the Class members' PII/PHI to be disclosed and misappropriated to the public and unauthorized third parties beyond Plaintiffs and the Class members' confidence, and without their express permission.

168.    But for Defendants' disclosure of T.C.'s and the Class members' PII/PHI in violation of the parties' understanding of confidence, their PII/PHI would not have been compromised, stolen, viewed, accessed, and/or used by unauthorized third parties. The Data Breach was the direct and legal cause of the theft of T.C.'s and the Class members' PII/PHI, as well as the resulting damages.

169.    The injury and harm Plaintiffs and the Class members suffered was the reasonably foreseeable result of Defendants' unauthorized disclosure of T.C.'s and the Class members' PII/PHI. Defendants knew their computer systems and technologies for accepting, securing, and storing T.C.'s and the Class members' PII/PHI had serious security vulnerabilities because Defendants failed to observe even basic information security practices or correct known security vulnerabilities.

170.    As a direct and proximate result of Defendants' breaches of confidence, Plaintiffs and the Class members have been injured and were damaged as discussed herein and as will be proven at trial. T.C. has been injured, as his PII and PHI was breached as detailed herein, and Ms. Camacho has suffered injury in the form of lost time and emotional distress as the guardian and caretaker responsible for protecting her minor child.

171.    Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII/PHI; illegal

000042/01330328_1

sale of the compromised PII/PHI on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach investigating the nature of the Data Breach not fully disclosed by Defendants, reviewing bank statements, payment card statements, and credit reports; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII/PHI; lost benefit of their bargains and overcharges for services; and other economic and non-economic harm.

## **Count 5**

## **BREACH OF EXPRESS CONTRACT**

**Against Rite Aid on Behalf of Plaintiffs, the Nationwide Class, and the Nationwide Minor Subclass, or Alternatively, on behalf of Plaintiffs, the California Subclass, and the California Minor Subclass**

172.    Plaintiffs repeat the allegations in paragraphs 1 – 120 in this Complaint, as if fully alleged herein, and assert this claim in the alternative to their breach of implied contract claim to the extent necessary.

173.    Rite Aid's Privacy Policy is an agreement between Rite Aid and consumers who purchase products or services from it.  Plaintiffs and Class members entered into this valid and enforceable express contract with Rite Aid.

174.    The Privacy Policy details how Ride Aid will both protect and use the PII/PHI provided by users of Rite Aid's products and services, including PII/PHI stored on or processed through Rite Aid's databases and systems that was provided to its third-party administrators, including CaptureRx.

175.    The Privacy Policy provides detailed information about what types of PII/PHI will be shared and with what entities. It further states that it "maintain[s] administrative, technical, and physical safeguards designed to protect personal information against accidental, unlawful, or unauthorized destruction, loss, alteration, access, disclosure, or use."[43]

176.    The HIPAA Notice, which is incorporated into the Privacy Policy, further specifies that it is "required by law to maintain the privacy and confidentiality of protected health information

---

[43] https://www.riteaid.com/legal/patient-privacy-policy (last visited May 25, 2021).

and to provide you with a notice of Privacy Practice's including our legal duties with respect to protected health information."[44]

177.    Rite Aid's HIPAA Notice also provides that it is "required by law to notify you following a breach of your unsecured protected health information."[45]

178.    Plaintiffs and Class members on the one hand and Rite Aid on the other formed a contract pursuant to the Privacy Policy (and incorporated HIPAA Notice) when Plaintiffs and Class members used Rite Aid's products and services. The clear or manifest intent of Rite Aid to provide benefits to its Customers, including Plaintiffs and Class members, through the protection of their PII/PHI that was stored or processed by Rite Aid in accordance with the terms of the Privacy Policy is evidenced by references in the Privacy Policy to its applicability to that PII/PHI, including in those portions of the Privacy Policy referenced in Paragraphs 29 through 34 of this Complaint.

179.    Rite Aid breached the Privacy Policy (and incorporated HIPAA Notice) contract, to the detriment of Plaintiffs and Class members, by failing to protect the PII/PHI. Specifically, Rite Aid (1) failed to use reasonable measures to protect that information; (2) disclosed that information to unauthorized third parties, in violation of the agreement; and (3) failed to notify Plaintiffs and Class members of the Data Breach within a reasonable time.

180.    As a direct result of Rite Aid's breach of contract, Plaintiffs and the Class members have suffered injury, have been damaged as described herein and as will be proven at trial, and are entitled to damages in an amount to be proven at trial. T.C. has been injured, as his PII and PHI was breached as detailed herein, and Ms. Camacho has suffered injury in the form of lost time and emotional distress as the guardian and caretaker responsible for protecting her minor child.

181.    Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII/PHI; illegal sale of the compromised PII/PHI on the black market; mitigation expenses and time spent on credit

---

[44]*Id.*
[45] *Id.*
000042/01330328_1

monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach investigating the nature of the Data Breach not fully disclosed by Rite Aid; reviewing bank statements, payment card statements, and credit reports; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII/PHI; lost benefit of their bargains and overcharges for services; and other economic and non-economic harm.

<div align="center">

**Count 6**

**BREACH OF IMPLIED CONTRACT**

Against Defendants on Behalf of Plaintiffs, the Nationwide Class, and the Nationwide Minor Subclass, or Alternatively, on behalf of Plaintiffs, the California Subclass, and the California Minor Subclass

</div>

182.     Plaintiffs repeat the allegations in paragraphs 1 – 120 in this Complaint, as if fully alleged herein, and assert this claim in the alternative to their breach of express contract claim to the extent necessary.

183.     As consideration for the healthcare services Defendants were to provide, Ms. Camacho provided T.C.'s PII/PHI, and Class members provided their PII/PHI to Defendants. When Ms. Camacho and Class members provided that PII/PHI to Defendants, they entered into implied contracts by which Defendants agreed to protect their PII/PHI and only use it solely to provide healthcare services. As part of the offer, Defendants would safeguard the PII/PHI using reasonable or industry-standard means.

184.     Accordingly, Ms. Camacho, on behalf of T.C., and the Class members accepted Defendants' offer to provide healthcare services (for which Defendants were compensated by Plaintiffs and Class members) and provided Defendants the PII/PHI. Plaintiffs and Class members fully performed their obligations under the implied contracts with Defendants. However, Defendants breached the implied contracts by failing to safeguard T.C.'s and Class members' PII/PHI.

185.     The losses and damages Plaintiffs and Class members sustained that are described herein were the direct and proximate result of Defendants' breaches of their implied contracts with them.  T.C. has been injured, as his PII and PHI was breached as detailed herein, and Ms. Camacho has suffered injury in the form of lost time and emotional distress as the guardian and caretaker

responsible for protecting her minor child. Additionally, because Plaintiffs and Class members continue to be Customers of Defendants, and because damages may not provide a complete remedy for the breaches alleged herein, Plaintiffs and Class members are therefore entitled to specific performance of the contracts to ensure data security measures necessary to properly effectuate the contracts maintain the security of their PII/PHI from unlawful exposure.

186.    Defendants' conduct as alleged herein also violated the implied covenant of good faith and fair dealing inherent in every contract, and Defendants are liable to Plaintiffs and Class members for associated damages and specific performance.

### **Count 7**

### **INTRUSTION UPON SECLUSION**

Against Defendants on Behalf of Plaintiffs, the Nationwide Class, and the Nationwide Minor Subclass, or Alternatively, on behalf of Plaintiffs, the California Subclass, and the California Minor Subclass

187.    Plaintiffs repeat the allegations in paragraphs 1 – 120 in this Complaint, as if fully alleged herein.

188.    Plaintiffs and Class members had a reasonable expectation of privacy in the PII/PHI that Defendants mishandled.

189.    By failing to keep T.C.'s and Class members' PII/PHI safe, and by misusing and/or disclosing said PII/PHI to unauthorized parties for unauthorized use, Defendants invaded Plaintiffs' and Class members' privacy by:

a.    Intruding into Plaintiffs' and Class members' private affairs in a manner that would be highly offensive to a reasonable person; and

b.    Publicizing private facts about Plaintiffs and Class members, which is highly offensive to a reasonable person.

190.    Defendants knew, or acted with reckless disregard of the fact that, a reasonable person in Plaintiffs' position would consider Defendants' actions highly offensive.

191.    Defendants invaded Plaintiffs' and Class members' right to privacy and intruded into Plaintiffs' and Class members' private affairs by misusing and/or disclosing their private information without their informed, voluntary, affirmative, and clear consent.

192.    As a proximate result of such misuse and disclosures, Plaintiffs' and Class members' reasonable expectation of privacy in their private information was unduly frustrated and thwarted. Defendants' conduct amounted to a serious invasion of Plaintiffs' and Class members' protected privacy interests.

193.    In failing to protect Plaintiffs' private information, and in misusing and/or disclosing their private information, Defendants have acted with malice and oppression and in conscious disregard of Plaintiffs' and Class members' rights to have such information kept confidential and private, in failing to provide adequate notice, and in placing its own economic, corporate, and legal interests above the privacy interests of its hundreds of thousands of users. T.C. has been injured, as his PII and PHI was breached as detailed herein, and Ms. Camacho has suffered injury in the form of lost time and emotional distress as the guardian and caretaker responsible for protecting her minor child. Plaintiffs and Class members, therefore, seek an award of damages, including punitive damages, on behalf of Plaintiffs and the Class.

194.    As child victims, T.C. and the Nationwide Minor and California Minor Subclass members have suffered greater harm from Defendants' privacy intrusion than adult victims and are thus entitled to increased damages, including punitive damages.

**Count 8**

**CALIFORNIA'S UNFAIR COMPETITION LAW**

*Cal. Bus. & Prof. Code §§ 17200, et seq.*

Against Defendants on Behalf of Plaintiffs, the Nationwide Class, and the Nationwide Minor

Subclass, or Alternatively, on behalf of Plaintiffs, the California Subclass,

and the California Minor Subclass

195.    Plaintiffs repeat the allegations in paragraphs 1 – 120 in this Complaint, as if fully alleged herein.

196.    Defendants are "persons" as defined by Cal. Bus. & Prof. Code § 17201.

197.   Defendants violated Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL") by engaging in unlawful, unfair, and deceptive business acts and practices.

198.   Defendants' unfair acts and practices include:

a.   Defendants failed to implement and maintain reasonable security measures to protect T.C.'s and Class members' PII/PHI from unauthorized disclosure, release, data breaches, and theft, which was a direct and proximate cause of the Data Breach. Defendants failed to identify foreseeable security risks, remediate identified security risks, and adequately improve security following previous cybersecurity incidents in the healthcare sector. This conduct, with little if any utility, is unfair when weighed against the harm to Plaintiffs and Class members whose PII/PHI has been compromised.

b.   Defendants' failure to implement and maintain reasonable security measures also was contrary to legislatively declared public policy that seeks to protect consumers' health information and data and ensure that entities that are trusted with it use appropriate security measures. These policies are reflected in laws, including HIPAA, HITECH, FTC Act, 15 U.S.C. § 45, California's Consumer Records Act, Cal. Civ. Code §§ 1798.81.5 *et seq.*, and California's Consumer Privacy Act, Cal. Civ. Code §§ 1798.100, *et seq.*

c.   Defendants' failure to implement and maintain reasonable security measures also lead to substantial consumer injuries, as described above, that are not outweighed by any countervailing benefits to consumers or competition. Moreover, because consumers could not know of Defendants' inadequate security, consumers could not have reasonably avoided the harms that Defendants caused.

d.   Engaging in unlawful business practices by violating Cal. Civ. Code § 1798.82.

199.   Defendants have engaged in "unlawful" business practices by violating multiple laws, including California's Consumer Records Act, Cal. Civ. Code §§ 1798.81.5 (requiring reasonable data security measures) and 1798.82 (requiring timely breach notification), California's Consumers

Legal Remedies Act, Cal. Civ. Code §§ 1780, *et seq.*, the FTC Act, 15 U.S.C. § 45, California's Consumer Privacy Act, Cal. Civ. Code §§ 1798.100, *et seq.*, and California common law.

200.    Defendants' unlawful, unfair, and deceptive acts and practices include:

a.    Failing to implement and maintain reasonable security and privacy measures to protect T.C.'s and Class members' PII/PHI, which was a direct and proximate cause of the Data Breach;

b.    Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents in the healthcare sector, which was a direct and proximate cause of the Data Breach;

c.    Failing to comply with common law and statutory duties pertaining to the security and privacy of T.C.'s and Class members' PII/PHI, including duties imposed by the HIPAA, HITECH, FTC Act, 15 U.S.C. § 45, California's Customer Records Act, Cal. Civ. Code §§ 1798.80, *et seq.*, and California's Consumer Privacy Act, Cal. Civ. Code §§ 1798.100 *et seq.*, which was a direct and proximate cause of the Data Breach;

d.    Misrepresenting that it would protect the privacy and confidentiality of T.C.'s and Class members' PII/PHI, including by implementing and maintaining reasonable security measures;

e.    Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of T.C.'s and Class members' PII/PHI, including duties imposed by HIPAA, HITECH, FTC Act, 15 U.S.C. § 45, and California's Customer Records Act, Cal. Civ. Code §§ 1798.80, *et seq.*; and California's Consumer Privacy Act, Cal. Civ. Code §§ 1798.100 *et seq.*

f.    Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure T.C.'s and Class members' PII/PHI; and

g.    Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of

T.C.'s and Class members' PII/PHI, including duties imposed by HIPAA, HITECH, FTC Act, 15 U.S.C. § 45; California's Customer Records Act, Cal. Civ. Code §§ 1798.80, *et seq.*; and California's Consumer Privacy Act, Cal. Civ. Code §§ 1798.100 *et seq.*

201.    Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' PII/PHI.

202.    Defendants intended to mislead Plaintiffs and Class members and induce them to rely on its misrepresentations and omissions.

203.    Had Defendants disclosed to Plaintiffs and Class members that their computer and data storage systems were not secure and, thus, vulnerable to attack, Defendants would have been unable to continue in business and they would have been forced to adopt reasonable data security measures and comply with the law. Instead, Defendants received, maintained, and compiled T.C.'s and Class members' PII/PHI, as part of the services Defendants provided and for which Plaintiffs and Class members paid, without advising Plaintiffs and Class members that Defendants' data security practices were insufficient to maintain the safety and confidentiality of T.C.'s and Class members' PII/PHI. Accordingly, Plaintiffs and Class members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

204.    Defendants acted intentionally, knowingly, and maliciously to violate California's Unfair Competition Law, and recklessly disregarded Plaintiffs' and Class members' rights. Past breaches within the healthcare industry put Defendants on notice that their security and privacy protections were inadequate.

205.    As a direct and proximate result of Defendants' unfair, unlawful, and fraudulent acts and practices, Plaintiffs and Class members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages as described herein and as will be proved at trial.  T.C. has been injured, as his PII and PHI was breached as detailed herein, and Ms. Camacho has suffered injury in the form of lost time and emotional distress as the guardian and caretaker responsible for protecting her minor child. These losses include the diminished

value of T.C.'s and Class members' PII/PHI. Because the integrity of T.C.'s and Class members' PII/PHI is crucial to their future ability to engage in many aspects of commerce, including obtaining a mortgage, credit card, business loan, tax return, or even applying for a job, the diminishment of the integrity of that PII/PHI corresponds to a diminishment in value. In other words, T.C. and Class members have both a present or future property interest diminished as a result of Defendants' unfair, unlawful, and fraudulent acts and practices.

206.    Plaintiffs and Class members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendants' unfair, unlawful, and fraudulent business practices or use of the PII/PHI; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

207.    As child victims, T.C. and the Nationwide Minor and California Minor Subclass members have suffered greater harm from Defendants' violation of the California Unfair Competition Law than adult victims.

## Count 9

## CALIFORNIA CUSTOMER RECORDS ACT

*Cal. Civ. Code §§ 1798.80, et seq.*

Against Defendants on Behalf of Plaintiffs, the California Subclass,

and the California Minor Subclass

208.    Plaintiffs repeat the allegations in paragraphs 1 – 120 in this Complaint, as if fully alleged herein.

209.    "[T]o ensure that Personal Information about California residents is protected," the California legislature enacted Cal. Civ. Code § 1798.81.5, which requires that any business that "owns, licenses, or maintains Personal Information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the Personal Information from unauthorized access, destruction, use, modification, or disclosure."

210.    Defendants are businesses that maintain Personal Information, within the meaning of Cal. Civ. Code § 1798.81.5, about customers, including Plaintiffs and Class members.

000042/01330328_1

211.    Businesses that maintain computerized data that includes Personal Information are required to "notify the owner or licensee of the information of the breach of the security of the data immediately following discovery, if the personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Cal. Civ. Code § 1798.82(b). Among other requirements, the security breach notification must include "the types of Personal Information that were or are reasonably believed to have been the subject of the breach." Cal. Civ. Code § 1798.82.

212.    Defendants are businesses that maintain computerized data that includes Personal Information as defined by Cal. Civ. Code § 1798.80.

213.    T.C.'s and Class members' PII/PHI includes Personal Information as covered by Cal. Civ. Code § 1798.82.

214.    Because Defendants reasonably believed that T.C.'s and Class members' PII, including PHI, was acquired by unauthorized persons during the Data Breach, Defendants had an obligation to disclose the Data Breach immediately following its discovery to the owners or licensees of the PII/PHI (*i.e.*, Plaintiffs and the Class), as mandated by Cal. Civ. Code § 1798.82. Indeed, Rite Aid's own HIPAA Notice states that it would provide affected individuals with notice of a data breach regarding PHI.

215.    By failing to disclose the Data Breach immediately following its discovery, Defendants violated Cal. Civ. Code § 1798.82.

216.    As a direct and proximate result of Defendants' violations of Cal. Civ. Code §§ 1798.81.5 and 1798.82, Plaintiffs and Class members suffered damages, as described above and as will be proven at trial. Specifically, T.C. has been injured, as his PII and PHI was breached as detailed herein, and Ms. Camacho has suffered injury in the form of lost time and emotional distress as the guardian and caretaker responsible for protecting her minor child.

217.    Plaintiffs and Class members seek relief under Cal. Civ. Code § 1798.84, including actual damages and injunctive relief.

## **Count 10**

## **CALIFORNIA CONSUMER PRIVACY ACT**

*Cal. Civ. Code §§ 1798.100 et seq.*

Against Defendants on Behalf of T.C., the California Subclass,

and the California Minor Subclass

218.    T.C. repeats the allegations in paragraphs 1 – 120 in this Complaint, as if fully alleged herein.

219.    Any consumers whose nonencrypted and nonredacted personal information, as defined in subparagraph (A) of paragraph (1) of subdivision (d) of Section 1798.81.5, was subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business's violation of their duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for violation of the California Consumer Privacy Act.

220.    T.C. and Class members are "consumer[s]" as that term is defined in Cal. Civ. Code. § 1798.140(g).

221.    Defendants are "businesses" as defined in Cal. Civ. Code. § 1798.140(c). Defendants are business entities organized or operated for the profit or financial benefit of its shareholders or other owners. Defendants do business in the state of California. Defendants collect consumers' (including T.C.'s and Class members') personal information and determine the purposes and means of the processing of this personal information (*e.g.*, they design the systems that process and store consumers' personal information). Defendants annually receive for the businesses' commercial purposes or shares for commercial purposes, alone or in combination, the personal information of 50,000 or more consumers.

222.    T.C.'s and Class members' PII/PHI is "nonencrypted and nonredacted personal information" as that term is used in Cal. Civ. Code § 1798.150(a)(1). At a minimum, this PII/PHI included the individuals' first name, last name, date of birth, and prescription information (and likely, health insurance information).

223.   The Data Breach constitutes "an unauthorized access and exfiltration, theft, or disclosure" pursuant to Cal. Civ. Code § 1798.150(a)(1).

224.   Defendants had a duty to implement and maintain reasonable security procedures and practices appropriate to the nature of T.C.'s and Class members' PII/PHI to protect said PII/PHI.

225.   Defendants breached the duties they owed to T.C. and Class members described above. Defendants breached these duties by, among other things, failing to: (a) exercise reasonable care and implement adequate security systems, protocols and practices sufficient to protect the PII/PHI of T.C. and Class members; (b) detect the breach while it was ongoing; and (c) maintain security systems consistent with industry standards.

226.   Defendants' breach of the duties they owed to T.C. and Class members described above was the direct and proximate cause of the Data Breach. As a result, T.C. and Class members suffered damages, as described above and as will be proven at trial.

227.   T.C. seeks injunctive relief in the form of an order enjoining Defendants from continuing the practices that constituted their breach of the duties owed to T.C. and Class members as described above. Concurrently with the filing of this Complaint, T.C. is serving a letter of notice on Defendants pursuant to Cal. Civ. Code § 1798.150(b) and anticipate amending this Complaint to seek statutory damages upon receipt of a written statement from Defendants in response to that letter of notice.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of all Class members proposed in this Complaint, respectfully request that the Court enter judgment in their favor and against Defendants as follows:

1)   For an Order certifying the Nationwide Class, the Nationwide Minor Subclass, the California Subclass, and the California Minor Subclass, as defined herein, and appointing Plaintiffs and Plaintiffs' counsel to represent the Class as alleged herein;

2)   For injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class members;

3)   For an award of compensatory, consequential, and general damages, including nominal damages, as allowed by law in an amount to be determined;

4)   For an award of statutory damages and punitive damages, as allowed by law, in an amount to be determined;

5)   For an award of restitution or disgorgement, in an amount to be determined;

6)   For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

7)   For prejudgment interest on all amounts awarded; and

8)   Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs, on behalf of themselves and the Class of all others similarly situated, hereby demand a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: June 4, 2021                    Respectfully submitted,

*/s/ Hassan A. Zavareei*

Hassan A. Zavareei (CA Bar No. 181547)
**TYCKO & ZAVAREEI LLP**
1828 L Street NW, Suite 1000
Washington, D.C. 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
Email: hzavareei@tzlegal.com

Daniel L. Warshaw (CA Bar No. 185365)
**PEARSON, SIMON & WARSHAW, LLP**
15165 Ventura Blvd., Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104
Email: dwarshaw@pswlaw.com

*Counsel for Plaintiffs and the Proposed Class and Subclasses*